Filed 8/22/24

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JUCARI SCOTT ANDERSON,<br><br>　　　Defendant and Appellant. | A166291<br><br>(Alameda County<br>Super. Ct. No. 19CR017742) |

After a shooting outside a bar in Berkeley, defendant Jucari Scott Anderson was convicted of multiple offenses, including being a felon in possession of a firearm. (Pen. Code § 29800, subd. (a)(1); all undesignated statutory references are to the penal code.) In the published portion of this opinion, we address defendant's claim that his felon-in-possession and related convictions violate his Second Amendment right to possess a firearm. (U.S. Const., 2d Amend.) We conclude that the statutes he challenges are constitutional, as they are "consistent with the principles that underpin" this nation's "regulatory tradition." (*United States v. Rahimi* (2024) 602 U.S. __, 144 S.Ct. 1889, 1898 (*Rahimi*), citing *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1, 26–31 (*Bruen*).)

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.

In the unpublished portion of this opinion, we also reject defendant's claim that the trial court improperly coerced a verdict after the jury reported it was deadlocked, and we reject most of his sentencing challenges.

## BACKGROUND

Early in the morning of November 10, 2019, after the bars had closed, Christopher B. and his friends were walking down Durant Avenue in Berkeley. Christopher was aware of people and noise on the street, but nothing made him fear for his safety before he heard gunshots and dropped to the ground, his ears ringing, and his legs feeling heavy. A friend told him he had been shot. At the hospital, Christopher was treated for gunshot wounds to both legs, which required surgery. It took him a year to recover from his physical injuries.

Defendant was tried and convicted of four felony offenses as a result of this shooting: assault with a semiautomatic firearm (§ 245, subd. (b)); possession of a firearm by a felon (§ 29800, subd. (a)(1) (§ 29800(a)(1))); possession of ammunition by a felon (§ 30305, subd. (a) (§ 30305(a))); and carrying a concealed firearm (§ 25400, subd. (a)(2) (§ 25400(a)(2))). The jury also found true allegations that defendant personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7) in committing the assault. In convicting on the assault count, the jury rejected defendant's claim of self-defense. In convicting on the remaining counts, the jury accepted defendant's testimony that he had previously been convicted of three felonies involving moral turpitude, and as a result was not allowed to possess or carry a firearm.

After the jury was excused, the trial court addressed defendant's prior convictions, finding true three allegations of prior felonies: a November 1999 Contra Costa County conviction for assault with a deadly weapon other than

2

a firearm (§ 245, subd. (a)(1)); a July 2000 Alameda County conviction for maliciously and intentionally shooting at an inhabited dwelling or motor vehicle (§ 246); and an August 2008 San Francisco County conviction for possession of a firearm by a felon (§ 12021, subd. (a)(1)). The trial court also found true allegations that defendant has a prior "strike" and prior serious felony conviction. (§§ 667, subds. (a)(1), (e)(1); 1170.12, subd. (c)(1)).

The court then sentenced defendant to 19 years in prison for the felony assault conviction, imposing concurrent or stayed terms for the remaining offenses. Neither at trial nor at sentencing did defendant raise the Second Amendment.

## DISCUSSION

### I. Second Amendment Claims

On appeal, defendant challenges the constitutionality of his convictions for being a felon in possession of a firearm, being a felon in possession of ammunition, and carrying a concealed firearm. (§§ 29800(a)(1), 30305(a), 25400(a)(2).) Defendant contends that convicting him of these offenses violates his rights under the Second Amendment, which declares: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.)

Although defendant did not raise the Second Amendment below, he has not forfeited the right to bring this constitutional challenge. His argument is, in the main, a facial challenge, one that requires us to "consider 'only the text of the measure itself, not its application to the particular circumstances of an individual.' " (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474 (*Alexander*).) Such a challenge may be raised and decided for the first time

3

on appeal. (*In re Sheena K.* (2007) 40 Cal.4th 875, 889; *People v. Patton* (2019) 41 Cal.App.5th 934, 946.)[1]

Our review is de novo, as the issues before us involve the reach and application of the Second Amendment. (*Alexander*, *supra*, 91 Cal.App.5th at p. 474.) We begin with an overview of recent United States Supreme Court decisions regarding the Second Amendment, and then apply the prescribed framework first to the firearm and ammunition prohibitions applicable to felons, and then to the prohibition on carrying a concealed weapon.

## A. Second Amendment Principles

In *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*), the Supreme Court interpreted the operative clause of the Second Amendment: "the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.) This language "codified a *pre-existing* right" under English and colonial American law, the Court explained, a right that is "exercised individually and belongs to all Americans." (*Heller*, at pp. 592, 581.) Specifically, the Second Amendment protects the "right to possess and carry weapons in case of confrontation," including "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." (*Id.* at pp. 592, 635.) Thus, the Court in *Heller* struck down the District of Columbia's prohibition on possessing usable handguns in the home. (*Id.* at

---

[1] Defendant characterizes his argument as also including an as-applied challenge, but the only circumstance on which he relies is that, by the time of the shooting, he had finished serving his prior sentence and reintegrated into society. To the extent this frames an as-applied challenge, we decline separately to consider it. (See *Zachary H. v. Teri A.* (2023) 96 Cal.App.5th 1136, 1143 [as-applied challenge to firearm restriction in restraining order "not appropriately raised for the first time on appeal"]; *People v. Gonzalez* (2020) 57 Cal.App.5th 960, 975 [criminal defendant who "failed to raise any constitutional challenge in the trial court" may "raise only a facial constitutional challenge on appeal"].)

p. 635.) "Assuming that [respondent] Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home," the Court concluded. (*Ibid*.)

In *McDonald v. City of Chicago* (2010) 561 U.S. 742 (*McDonald*), the Supreme Court addressed similar ordinances passed by municipal governments, again striking down prohibitions on possessing a handgun in the home. The Second Amendment right recognized in *Heller* "applies equally to . . . the States" through the Due Process Clause of the Fourteenth Amendment, the Court concluded. (*Id*. at p. 791.) But *McDonald* recognized, as *Heller* had, that this "right was not unlimited, just as the First Amendment's right of free speech was not." (*Heller*, *supra*, 554 U.S. at p. 595; *McDonald*, at p. 786.) *McDonald* repeated the "assurances" in *Heller* that its holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' " (*McDonald*, at p. 786, quoting *Heller*, at pp. 626–627.)

In *Bruen*, *supra*, 597 U.S. 1, the Supreme Court extended *Heller* and *McDonald* beyond hearth and home. There, the Court held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home," and the State of New York could not condition issuance of a license to carry on a citizen showing a particularized "special need" for armed defense. (*Id*. at pp. 10–11.) Again the Court sought to avoid being misunderstood, cautioning that "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . licensing regimes"

5

that "require applicants to undergo a background check or pass a firearms safety course," as these "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" (*Id.* at p. 38, fn. 9.)

The *Bruen* Court also set forth a framework to guide courts in assessing Second Amendment claims: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." (*Bruen, supra*, 597 U.S. at p. 17.) In seeking to show that a current regulation meets this standard, the government may reason by analogy and need only "identify a well-established and representative historical *analogue*, not a historical *twin*." (*Id.* at p. 30.) Relevant historical precedent may be found "from before, during, and even after the founding" of our nation. (*Id.* at p. 27.) "[An] historical regulation is a proper analogue for a distinctly modern firearm regulation" when it is "relevantly similar," in the sense that both "burden a law-abiding citizen's right to armed self-defense" in a similar way and for similar reasons. (*Id.* at pp. 28, 29.)

In *Rahimi*, the Supreme Court applied this method to reject a Second Amendment challenge to a statute prohibiting a person subject to a domestic violence restraining order from possessing a firearm. (*Rahimi, supra*, 602 U.S. at p. __ [144 S.Ct. at p. 1894]; see 18 U.S.C. § 922, subd. (g)(8).) No historical evidence suggested the founding generation had any familiarity with domestic violence restraining orders, let alone a practice of disarming those subject to them, but the high court had "no trouble concluding" the

statute survives constitutional challenge. (*Rahimi*, at p. __ [at p. 1902].) Supreme Court "precedents were not meant to suggest a law trapped in amber," the *Rahimi* Court emphasized. (*Id.* at pp. __ [at pp. 1897–1898].) "[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791." (*Ibid.*) The *Rahimi* Court reviewed historical evidence drawn from English and early American law and concluded that these older firearm regulations "confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." (*Id.* at p. __ [at p. 1901].)

*Rahimi* does not resolve the case before us, as the statute it analyzed "applies only once a court has found that [an individual] defendant 'represents a credible threat to the physical safety' of another." (*Rahimi*, *supra*, 602 U.S. at pp. __ [144 S.Ct. at pp. 1901–1902], quoting 18 U.S.C. § 922, subd. (g)(8).) But the high court purposefully did "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." (*Rahimi*, at p. __ [at p. 1901].) In this way, *Rahimi* re-affirms the portion of *Heller* that cautions, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." (*Heller*, *supra*, 554 U.S. at p. 626.)

We now assess defendant's claims pursuant to the framework these precedents prescribe.

## B. Firearm Restrictions Based on Prior Criminality

Section 29800(a)(1) makes it unlawful for any person who has been convicted of a felony to possess a firearm. Section 30305(a) provides that

7

persons who are prohibited from possessing a firearm due to their felony status are also prohibited from possessing ammunition. Defendant contends these statutes punish conduct that is presumptively protected by the Second Amendment, and that the People cannot demonstrate that disarming felons is consistent with historic tradition. We agree with the first part of defendant's argument, but not the second.

### 1. Textual Analysis

The threshold question is whether the conduct for which defendant was punished is covered by the plain text of the Second Amendment. (*Bruen, supra,* 597 U.S. at pp. 17, 22, 32.) The United States Supreme Court's construction of two key phrases in the Second Amendment informs this analysis.

First, the *Heller* Court addressed how to define "the people" whose rights the Second Amendment protects. It concluded that the term "the people," as used in the Second Amendment, " 'refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.' " (*Heller*, *supra*, 554 U.S. at p. 580.) Drawing parallels, the Court pointed out that the First Amendment recognizes a "right of the people" in its Assembly-and-Petition Clause, and that the Fourth Amendment does so in its Search-and-Seizure Clause. (*Heller*, at p. 579.) In these contexts and in the Second Amendment, the term "unambiguously refers to all members of the political community, not an unspecified subset," the Court determined. (*Heller*, at p. 580.)

Second, the Court has interpreted the Second Amendment phrase "to keep and bear Arms." Rejecting the notion that this was a term of art restricted to the act of being armed for purposes of militia service, the Court

8

construed this phrase as conferring a "right to possess and carry weapons in case of confrontation" more generally, both in the home (*Heller*, *supra*, 554 U.S. at pp. 582–589, 592) and in public (*Bruen*, *supra*, 597 U.S. at pp. 32–33).

Employing these definitions, we have no trouble concluding defendant was convicted for conduct presumptively protected by the Second Amendment. He is an adult citizen being punished for possessing a firearm and ammunition. Disputing this legal conclusion, the People argue that, because defendant is a convicted felon, his conduct falls completely outside the purview of the Second Amendment. They construe "the people," as referenced in the Second Amendment, to mean only law-abiding citizens, and they posit that convicted felons are by definition not law abiding.

*Heller* and *Bruen* do characterize the Second Amendment right as one belonging to "law-abiding citizens." (See, e.g., *Heller*, *supra*, 554 U.S. at p. 635 ["the right of law-abiding, responsible citizens to use arms in defense of hearth and home"]; *Bruen*, *supra*, 597 U.S. at pp. 8–10, 32 ["the right of an ordinary, law-abiding citizen to possess a handgun . . . for self-defense"].) The People construe these remarks as proof that *only* law-abiding, responsible citizens are among "the people" covered by the text of the Second Amendment, and some California courts have embraced this view. (See *Alexander*, *supra*, 91 Cal.App.5th at p. 478; *People v. Odell* (2023) 92 Cal.App.5th 307; *People v. Ceja* (2023) 94 Cal.App.5th 1296.) We reject this framing although, by a different route, ultimately will reach the same result as these California cases.

Because, as a factual matter, both *Heller* and *Bruen* involved claims brought by law-abiding citizens, neither case presented the question whether citizens who are not law-abiding have Second Amendment rights. (*Heller*, *supra*, 554 U.S. at pp. 575, 628; *Bruen*, *supra*, 597 U.S. at pp. 31, 12; see

9

*Rahimi*, *supra*, 602 U.S. at p. __ [144 S.Ct. at p. 1903] ["In *Heller* and *Bruen*, we . . . said nothing about the status of citizens who were not 'responsible.' The question was simply not presented"].)  But when *Heller* expressly addressed the question of who enjoys rights under the Second Amendment, the Court concluded the right "belongs to all Americans."  (*Heller*, at p. 581.)  We decline to exclude any American from the national community that "We the People" formed by adopting the United States Constitution and then reformed with two centuries of constitutional amendments.  (U.S. Const., Preamble.)  We see no basis for categorically excluding persons with prior felony convictions from the protections of the Bill of Rights.

True, *Heller* acknowledged that the right protected by the Second Amendment is "not unlimited," and that lawful restrictions on its reach could take the form of categorical disarmament.  (*Heller*, *supra*, 554 U.S. at pp. 626–627.)  But consider the context in which the Court cited such "prohibitions on the possession of firearms by felons and the mentally ill" as "presumptively lawful" regulation.  (*Ibid*., & fn. 26.)  *Heller* makes this comment, not in the course of analyzing *who* enjoys rights under the Second Amendment, but in addressing the extent to which the government can limit the right.  This distinction is not academic; the initial question defines the scope of the right, whereas the second concerns the circumstances under which the right may be taken away.

Sometimes the difference matters.  As then-Judge Barrett pointed out, a state may elect to "disarm certain people (for example, those convicted of crimes of domestic violence), but if it refrains from doing so, their rights remain constitutionally protected.  In other words, a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes *eligible* to lose it."  (*Kanter v. Barr* (7th Cir. 2019) 919

10

F.3d 437, 453, dis. opn., Barrett, J. (*Kanter*), maj. opn. abrogated in part by *Bruen*, *supra*, 591 U.S. at p. 18.)

We accordingly join those courts that have rejected the "contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." (*Range v. Attorney General of the United States*. (3rd Cir. 2023) 69 F.4th 96, 103 (*Range*), judg. vacated and remanded by *Garland v. Range* (2024) __ U.S. __ [2024 U.S. Lexis 2917] [cause remanded for further consideration in light of *Rahimi*, *supra*, 602 U.S. at p. __ [144 S.Ct. at p. __]]; see e.g. *U.S. v. Perez-Garcia* (9th Cir. 2024) 96 F.4th 1166, 1180 [Supreme Court "has never suggested that felons are not among 'the people' within the plain meaning of the Second Amendment"]; *U.S. v. Duarte* (9th Cir. 2024) 101 F.4th 657, 671, judg. vacated and cause ordered to be reheard en banc, *U.S. v. Duarte* (9th Cir. July 17, 2024, No. 22-50048) [2024 U.S. App.Lexis 17601] ["meaning of 'the people' in the Second Amendment included, at a minimum, all American citizens"].) Governing law compels us to find that the Second Amendment applies to defendant notwithstanding his status as a felon, and presumptively protects his right to possess a loaded firearm. We must therefore address whether California laws preventing this conduct are "consistent with the principles that underpin" the nation's historical tradition of firearm regulation. (*Rahimi*, *supra*, 602 U.S. at p. __ [144 S.Ct. at p. 1898].)

### 2. Historical Tradition

As we have noted, *Heller* describes "prohibitions on the possession of firearms by felons" as "longstanding" and "presumptively lawful" (*Heller*, *supra*, 554 U.S. at pp. 626–627 & fn. 26), and subsequent Supreme Court cases reiterate this point. (See *McDonald*, *supra*, 561 U.S. at pp. 750, 786 [same]; *Bruen*, *supra*, 597 U.S. at p. 38, fn. 9 ["nothing in our analysis should

be interpreted to suggest the unconstitutionality of" background check requirements to ensure applicants are " 'law-abiding, responsible citizens' "]; *Bruen*, at pp. 80–81 (conc. opn. of Kavanaugh, J.) [Second Amendment allows " 'longstanding prohibitions on the possession of firearms by felons' "]; *Rahimi, supra*, 602 U.S. at p. __ [144 S.Ct. at p. 1901] [citing this portion of *Heller*].) The repeated observation is useful in that it suggests a view as to the likely outcome of our analysis, but it does not supplant the historical exegesis that *Bruen* and *Rahimi* require.

Undertaking that analysis here, we conclude that sources from 17th Century England, colonial America, and the early federal period demonstrate that California's felon-in-possession firearm regulations comport with our national tradition of firearm regulation. In that tradition, categories of persons thought to pose a danger to the community were forbidden to have arms, and individuals were sometimes disarmed as a consequence of being convicted of criminal conduct. When the founding generation framed and debated constitutional text, it considered such limitations inherent in the right the Second Amendment protects.

### a. English Legal History

In analyzing the American tradition of firearm regulation, *Heller* all but requires that we begin with early English legal history. This is because the Second Amendment "codified a *pre-existing* right," whose predecessor "has long been understood to be" a provision in the English Bill of Rights. (*Heller, supra*, 554 U.S. at pp. 592–594; see also *id.* at p. 599 [Second Amendment "codified a right 'inherited from our English ancestors' "]; O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms* (2019) 95 Notre Dame L. Rev. 397 (hereafter O'Scannlain); Malcolm, To Keep and Bear Arms: The Origins of an

12

Anglo-American Right (1994) pp. 31–53 (hereafter Malcolm).) This English charter was adopted a century before our Bill of Rights, as an enumeration of essential liberties that Prince William of Orange was expected to honor when he became king in the near bloodless coup now known as the Glorious Revolution. (O'Scannlain, at pp. 403–405.) The English Bill of Rights declares " 'that the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law.' " (*Rahimi, supra,* 602 U.S. at p. __ [144 S.Ct. at p. 1899], quoting 1 Wm. & Mary c.2, § 7 in 3 Eng. Stat. at Large 440 (1689) 441.)

Three limitations in this formulation merit attention. First, in 1689 the right to have arms belonged only to " 'Protestants.' " The half century leading up to the Glorious Revolution had opened with the English Civil War—a struggle for supremacy between King Charles I and Parliament—and had seen continuing religious strife. (O'Scannlain, *supra,* 95 Notre Dame L. Rev. at pp. 401–402.) When Parliament enjoyed the upper hand, the militia disarmed Catholics, royalists, and other dissenters; when the tables turned, the king's forces disarmed Protestants. (*Id.* at pp. 402–403.) With the Glorious Revolution, Parliament invited William of Orange to occupy the throne if he would foreswear disarming Protestants. (*Id.* at p. 404.)

The second notable aspect of this English right is that it extended only as " 'suitable to [a subject's] condition[].' " (O'Scannlain, *supra,* 95 Notre Dame L. Rev. at p. 404.) One example of a condition rendering a person unsuitable to having arms was described in the Game Act of 1671, which imposed property qualifications on the right to hunt at a level that effectively prohibited the vast majority of Englishmen from having arms. (O'Scannlain, at pp. 402–403 [though enforcement was selective].) So, lack of wealth was a condition justifying disarmament under English law. Another example

13

comes from the Militia Act of 1662, which "authorized the King's agents to 'seize all Armes in the custody or possession of any person . . . judge[d] dangerous to the Peace of the Kingdome.' " (*Rahimi, supra,* 602 U.S. at p. __ [144 S.Ct. at p. 1899], quoting 14 Car. 2 c. 3, § 13 (1662).) Perceived dangerousness was thus also a disqualifying condition. (See *U.S. v. Carpio-Leon* (4th Cir. 2012) 701 F.3d 974, 980 (*Carpio-Leon*) ["In England, the right to bear arms allowed the government to disarm those it considered disloyal or dangerous"]; Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the 2nd Am* (2007) 25 Law & Hist. Rev. 139, 150 (hereafter Churchill) ["English statutes allowed officers of the Crown broad powers to disarm Englishmen on the basis of faith, class, or perceived 'dangerousness' "].)

A third important aspect of this right to arms was that its exercise remained subject to the regulation of Parliament. According to the text of the English Bill of Rights, an Englishman had a right to arms only "as allowed by Law." (1 Wm. & Mary c.2, § 7 in 3 Eng. Stat. at Large 440 (1689) 441.) In short, as *Heller* frankly acknowledges, this important predecessor to our Second Amendment recognized a right "not available to the whole population" and "held only against the Crown, not Parliament." (*Heller, supra,* 554 U.S. at p. 592; see also *Rahimi, supra,* 602 U.S. at p. __ [144 S.Ct. at p. 1899] ["The Glorious Revolution cut back on the power of the Crown to disarm its subjects unilaterally" but "the principle that arms-bearing was constrained 'by Law' remained"].) What is the meaning of a right that the legislature can regulate, one might ask? William Blackstone, whose works " 'constituted the preeminent authority on English law for the founding generation' " (*Heller, supra,* 554 U.S. at pp. 593–594), explained that the "liberties of Englishmen" belonged only to "m[e]n of rank or property" and

14

were subject to "necessary restraints"—meaning restraints "so gentle and moderate, as will appear upon farther enquiry, that no man of sense or probity would wish to see them slackened." (1 Blackstone, Commentaries on the Laws of England 140 (1765).) In short, English law required the legislature to respect certain people's liberties, but those liberties were still subject to moderate and sensible regulation.

### b. Disarmament in Colonial and Early Federal Practice

The English tradition of disarming those whom Parliament did not trust to be law-abiding or loyal members of society carried over to the American colonies and persisted as the colonies became new states. (*Carpio-Leon*, *supra*, 701 F.3d at p. 980; *Range*, *supra*, 69 F.4th at pp. 122–124 (dis. opn. of Krause J.); see also *Rahimi*, *supra*, 602 U.S. at p. __ [144 S.Ct. at p. 1899].) Legislatures disarmed whole classes of people they considered dangerous, while courts sometimes disarmed individuals when imposing criminal punishment.

Well documented and widespread were laws that prohibited arms for particular racial groups. In the 17th Century, both Virginia and Massachusetts made it a crime for anyone to sell (or give) a Native American a firearm or ammunition. (Malcolm, at p. 140.) The concern was not only to limit access to weapons among a population against whom the colonists might one day go to war. New York passed a law in 1656 preventing " 'any Indians with a gun' " from entering into any house, " 'to prevent . . . isolated murders and assassinations.' " (Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms* (2020) 20 Wyo.L.Rev. 249, 262, fn. 76 (hereafter Greenlee).) Equally odious were colonial-era laws preventing African Americans from possessing arms. These enactments were often aimed at enslaved persons but sometimes extended to free persons of

15

African descent as well. For example, in 1640 Virginia passed " 'An Act Preventing Negroes from Bearing Arms,' " which was directed at enslaved persons, but in 1680 the colonial legislature expanded the prohibition to reach all African Americans in the colony. (Malcolm, at p. 141; see also Churchill, *supra*, 25 Law & Hist. Rev. at p. 156 ["white Virginians excluded African-Americans, Indians, and indentured servants from the body politic and denied them the most fundamental of rights"].) And South Carolina, which originally allowed free African Americans to be armed and serve in the militia, reversed course and outlawed this during the 18th Century. (Malcolm, at p. 141.)

Religion, too, was used as a basis for denying certain colonists a right to have arms. Catholics were disarmed by statute in New York in 1696, and in Pennsylvania, Maryland, and (with exceptions) Virginia sixty years later. (*Range*, *supra*, 69 F.4th at pp. 123–124, 125 (dis. opn. of Krause J.); Greenlee, *supra*, 20 Wyo.L.Rev. at p. 263.) In the 1640s, Virginia also disarmed nonconformist Protestants because they rejected "the King's sovereign power over religion." (*Range*, at p. 123.) And a century later, New Jersey confiscated firearms from members of the Moravian Church, another group of nonconformist Protestants. (*Id*. at p. 124.) The Moravians and Quakers were committed pacifists, so these legislative acts would not have been motivated by fear of an armed uprising. Rather, these religious dissenters' nonconformist convictions were "sufficient evidence that they could not be trusted to obey royal authority." (*Ibid*.)

Disarmament was also an accepted sanction for an individual's criminal behavior in colonial America. In Virginia in 1736, a legal manual provided "that a constable 'may take away Arms from such who ride, or go, offensively armed, in Terror of the People' and may bring the person and

16

their arms before a Justice of the Peace." (Greenlee, *supra*, 20 Wyo.L.Rev. at p. 262.) This is one example of the " 'going armed' laws" that were well known in colonial America. (*Rahimi, supra*, 602 U.S. at p. __ [144 S.Ct. at pp. 1900–1901].) Inherited from "the ancient common-law prohibition on affrays," these prohibitions on going armed in a manner that disrupted public order were enforced "with 'forfeiture of the arms . . . and imprisonment.' " (*Id*. at p. __ [at p. 1901], citing 4 Blackstone, Commentaries 149.)

Persons convicted of other types of criminal conduct were also on occasion disarmed, even when the crime involved no threat of physical harm. In Virginia in 1624, a man named Richard Barnes gave " 'base and detracting speeches concerning the Governor.' " (Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia* (1982) 26 Am. J. of Legal Hist. 354, 371 (hereafter Konig).) For this crime the Virginia Council ordered him disarmed, and otherwise punished. In Massachusetts in 1637, Anne Hutchinson was convicted of sedition "for criticizing the colony's clergy for its legalistic interpretation of the Bible." (Greenlee, *supra*, 20 Wyo.L.Rev. at p. 263.) For this crime she and some of her supporters were banished, but many other supporters were permitted to remain in the colony and punished instead with disarmament. (*Ibid*.; see also *Range, supra*, 69 F.4th at p. 123 (dis. opn. of Krause, J.).)

"Disaffected persons became an even greater concern for the colonists as the Revolutionary War approached." (Greenlee, *supra*, 20 Wyo.L.Rev. at p. 263.) In Connecticut in 1775, while those "who actively assisted the British were imprisoned and forfeited their entire estate," those who merely "libeled or defamed acts of the Continental Congress" were prohibited from keeping arms, and also prohibited from voting, holding public office, or serving in the military. (*Id*. at p. 264.) In 1776, the Continental Congress

17

recommended that all the colonies "disarm persons 'who are notoriously disaffected to the cause of America' " or refuse " 'to defend, by arms, these United Colonies.' " (*Ibid*.)  Many colonies enacted such laws; some went further.  In 1777, North Carolina stripped " 'all Persons failing or refusing to take the Oath of Allegiance' of any citizenship rights," including the right to " 'keep Guns or other Arms within [the] house.' " (*Id*. at pp. 264–265.)  The same year, Pennsylvania and Maryland likewise disarmed those unwilling to swear an oath of allegiance, and also prohibited them from voting, holding public office, serving on juries, and filing lawsuits.  (Churchill, *supra*, 25 Law & Hist. Rev. at pp. 159–160.)

Disarmament remained an available penalty for law-breaking in the early federal period.  For example, most people convicted of participating in Shays' rebellion in Massachusetts in 1786 were eligible for pardons, but to obtain one they had to turn in their weapons and remain disarmed for a period of three years.  They were also, during this time, ineligible to vote, serve as a juror, or hold public office.  (Cornell & DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control* (2004) 73 Fordham L.Rev. 487, 507–508.)  This punishment echoed the one handed down in Massachusetts 150 years earlier for colonists who subscribed to Anne Hutchinson's heresies.

### c.  Constitution Making in the Early Federal Period

The American right to keep and bear arms received its first constitutional protection, not in the Second Amendment but in state constitutions beginning in 1776.  (Volokh, *State Constitutional Rights to Keep and Bear Arms* (2006) 11 Tex. Rev. L & Pol. 191, 193–204.)  Article XIII of the Pennsylvania Declaration of Rights adopted that year provides, "[t]hat the people have a right to bear arms for the defence of themselves and the

18

state . . . ." (Volokh, at p. 202, fn. 62.) North Carolina adopted a similar provision in its 1776 constitution, and Vermont added Pennsylvania's version in 1777. (Volokh, at pp. 201, 204.) In 1780, Massachusetts adopted a constitution that provided: "The people have a right to keep and to bear arms for the common defence." (*Id*. at p. 197, 198, fn. 34.)

The *Heller* Court read these state constitutional provisions as "secur[ing] an individual right to bear arms for defensive purposes," and reasoned that the federal Second Amendment protected a similar right. (*Heller, supra*, 554 U.S. at pp. 601–604.) Thus, in construing the Second Amendment it is useful to observe that two of these four states— Pennsylvania and North Carolina—passed statutes disarming citizens for refusing to take a loyalty oath the year after they added the right to bear arms to their state constitutions. And in Massachusetts, the legislature imposed disarmament as a sanction for participants in Shays' rebellion just a few years after the state adopted its Second Amendment equivalent. The lesson we draw from this historical evidence is that the founding generation did not consider the constitutional right to arms inherited from the English legal tradition to be inconsistent with legislative enactments disarming individuals convicted of serious crimes or otherwise dangerous to the community.

We are confirmed in this view by historical accounts of deliberations over whether to ratify the federal Constitution. In 1787, Antifederalist delegates at the Pennsylvania ratifying convention proposed a list of amendments they considered necessary, if they were to agree to the new federal Constitution. ("The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787," in Schwartz, The Bill of Rights: A Documentary History (1971) pp. 662–666

19

(hereafter Schwartz).)  Among these was a provision stating, "That the people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals . . . .*" (*Id*. at p. 665, italics added.)  Although a majority of the delegates at the ratifying convention approved the proposed Constitution without these amendments, the minority's formulation of this right to arms is evidence that the public in the founding era understood that "crimes committed" could justify the state disarming a person, whether or not the perpetrator also posed a "real danger of public injury." (*Ibid*.; see also *Medina v. Whitaker* (D.C. Cir. 2019) 913 F.3d 152, 158–159 (*Medina*); *U.S. v. Skoien* (7th Cir. 2010) 614 F.3d 638, 640 (en banc) (*Skoien*); *Range, supra,* 69 F.4th at p. 126 (dis. opn. of Krause, J.).)

To the same effect, but less explicit, was a proposal that Samuel Adams made in the Massachusetts ratifying convention.  Like the Antifederalists in Pennsylvania, Adams opposed ratifying the federal Constitution without amending it to include a declaration of rights.  (Greenlee, *supra,* 20 Wyo.L.Rev. at p. 265.)  Among the amendments he proposed was a guarantee that the Constitution would never be construed " 'to prevent the people of the United States *who are peaceable citizens*, from keeping their own arms.' " (*Id*. at pp. 265–266, italics added.)  "Peaceable" is not a precise word; according to Noah Webster it meant " '[n]ot violent, bloody or unnatural.' " (Greenlee, at p. 266, fn. 111, citing 1828 edition of Webster's American Dictionary of the English Language.)  Likely the delegates to the Massachusetts ratifying convention would not have considered felony conduct as "peaceable."

When the Pennsylvania and Massachusetts proposals are considered together, especially in light of all that had come before, they evince a common

20

understanding amongst the founding generation that legislatures could disarm persons unwilling or unable to follow the law.  When the Second Amendment codified the same "*pre-existing* right" a few years later (*Heller, supra,* 554 U.S. at p. 592), it likewise allowed such measures.  (See Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms (2008), p. 263 [those who drafted ratifying convention proposals understood Second Amendment to allow for disarming criminals]; Marshall, *Why Can't Martha Stewart Have a Gun?* (2009) 32 Harv. J.L. & Pub. Policy 695, 713 ["Second Amendment was viewed as consistent with . . . the proposals from Pennsylvania and Massachusetts"]; Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America (2006) pp. 28, 35 [states "retained the right to disarm groups deemed to be dangerous" and to disarm individuals].)

### 3.  Defendant's Challenge in Light of *Rahimi*

Surveying the historical record, defendant points out several ways he perceives it to fall short.  He argues, first, that none of the 17th and 18th Century sources is a categorical ban on felons possessing firearms, and California's earliest such statute dates only to 1923.  (Citing e.g. *People v. Domenico* (1953) 121 Cal.App.2d 124, 126–127.)  Second, statutes that disarmed persons based on their race or religion would never survive scrutiny under the Fourteenth Amendment and, he contends, in England and colonial America these laws were intended for the different purpose of preventing armed insurrection.  Third, some of the statutes and criminal penalties requiring a person to forfeit arms fell short of a lifetime ban on possessing arms; a person might have his forfeited arms returned after a period of years, or be allowed to procure replacement weapons.  (Citing *Range, supra,* 69

21

F.4th at pp. 105–106.)[2]  And fourth, defendant asserts the proposals from the state ratifying conventions are unpersuasive because they were rejected.

    We agree with defendant on his first point.  California's felon disarmament rule is now more than a century old and can appropriately be characterized as "longstanding."  (See *Heller, supra*, 554 U.S. at p. 626.)  But we doubt that any 20th Century statute is persuasive evidence of what the founding generation understood it was adopting with the Second Amendment to the Constitution.  And even if historical evidence through the Reconstruction era might be considered relevant (see *Rahimi, supra*, 602 U.S. at p. __, fn. 1, __ [144 S.Ct. at p. 1898, fn. 1, 1906]), the government has cited no felon disarmament statute predating the 20th Century.  So, if California's statutes forbidding felons from possessing firearms or ammunition are to

_____

[2] Defendant relies on two federal cases that fail to assist him.  The first is *Range,* a Second Amendment challenge to a federal statute similar to Section 29800.  (See *Range, supra*, 69 F.4th at p. 98 [discussing 18 U.S.C. § 922, subd. (g)(1)].)  In a decision the Third Circuit is now reconsidering in light of *Rahimi*, the *Range* majority found the statute unconstitutional as applied to a man whose prior conviction was for a nonviolent crime unrelated to firearms, a crime denominated a misdemeanor under state law, albeit one punishable by up to five years in prison.  (*Range,* at pp. 98, 104–105, 106.)  By contrast here, no as-applied challenge is before us, and there was nothing non-violent or anomalous about defendant's prior felony convictions.

In defendant's second case, *United States v. Bullock* (S.D.Miss. 2023) 679 F.Supp.3d 501, the district court granted a motion to dismiss on Second Amendment grounds an indictment charging the defendant with violating the same federal statute.  But *Bullock* offers no assistance on the issue of historical analogues, as the case was dismissed for the government's failure to provide *any* historical record "to prove the underlying principle of disarmament."  (*Id*. at p. 537.)  Here, the historical evidence we discuss is cited in the government's appellate briefs, in the cases cited there, or in books and articles cited in those cases.

survive Second Amendment scrutiny, it must be because the older historical material demonstrates these statutes are "consistent with the principles that underpin our regulatory tradition." (*Rahimi*, *supra*, 602 U.S. at p. __ [144 S.Ct. at p. 1898].)

In the course of applying *Rahimi*'s standard we will respond to defendant's remaining points, but let us first take a closer look at that case. The federal statute challenged in *Rahimi* disarms an individual found to " 'represent[] a credible threat to the physical safety' " of someone protected by a domestic violence restraining order. (*Rahimi*, *supra*, 602 U.S. at pp. __ [144 S.Ct. at pp. 1901–1902].) The statute prohibits restrained individuals from possessing a firearm, whether or not they had previously been convicted of a crime. (*Id*. at p. __ [at p. 1947].) The *Rahimi* Court began its analysis of this targeted disarmament provision by surveying English legal history from centuries past, then discussed "two distinct legal regimes" that had developed in American law by the time of the founding to deal with gun violence. (*Id*. at pp. __ [at pp. 1899–1901].) First were the surety laws. These authorized a magistrate to require an individual to post a bond when there was " 'probable ground to suspect . . . future misbehavior.' " (*Id*. at p. __ [at p. 1899].) An individual who failed to post the required bond would be jailed; one who posted the bond and then broke the peace would forfeit the bond. (*Id*. at p. __ [at p. 1900].) The second category of laws were the "going armed" laws that we have discussed above. (*Id*. at p. __ [at p. 1901].) Of course, the statute challenged in *Rahimi* "is by no means identical to these founding era regimes, but it does not need to be." (*Ibid*.)

The Court concluded the challenged statute and these founding era laws were " 'relevantly similar' . . . in both why and how [they] burden[] the Second Amendment right." (*Rahimi*, *supra*, 602 U.S. at p. __ [144 S.Ct. at

23

p. 1901].)  The challenged statute "restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do;" it does not "broadly restrict arms use by the public generally."  (*Ibid*.)  The challenged statute imposes a similar burden on the right to bear arms because, like the surety and going armed laws, it imposes temporary disarmament after a judicial determination that "a particular defendant likely would threaten or had threated another with a weapon."  (*Id*. at pp. __ [at pp. 1901–1902].)  And the penalty in the challenged statute is not disproportional.  Under the going armed laws, "imprisonment was permissible to respond to the use of guns to threaten the physical safety of others," so the Court reasoned "the lesser restriction of temporary disarmament . . . is also permissible."  (*Id*. at p. __ [at p. 1902].)  In sum, the *Rahimi* Court concluded the challenged statute "fits neatly within the tradition the surety and going armed laws represent."  (*Id*. at p. __ [at p. 1901].)

Taking a similarly thematic approach, we reach a similar conclusion. Here we have three kinds of historical evidence.  First are the categorical disarmament laws, which prohibited categories of people from owning firearms based on their race, religion, or unwillingness to swear an oath of allegiance.  Second are the criminal penalties, whereby individuals were disarmed as a consequence of their own criminal conduct.  Examples are Richard Barnes in Virginia, Hutchinson's followers and Shays' collaborators in Massachusetts, and unnamed individuals prosecuted in multiple colonies under the going armed laws.  And third are the ratifying conventions' proposed constitutional provisions, which protected a right to arms that could be abrogated "for crimes committed," or upon evidence that a person posed a

24

"danger of public injury" or was not a "peaceable citizen[]." (See *ante*, Part I.B.2.c., italics omitted.)

To be clear, in relying on this historical evidence we do not in any way endorse these particular laws and practices. Defendant is surely correct that disarmament based on racial categories or religious affiliation is odious to the Constitution, as amended after the Civil War. And today the First Amendment would no doubt bar criminal punishment for the political and religious speech of Richard Barnes or the followers of Anne Hutchinson. But the point remains that these historical practices show the generation that adopted the Second Amendment understood the right it was enshrining in the Constitution to be limited. The right to arms familiar to them allowed for both categorical disarmament of groups that the legislature assessed as threatening to the community, and individual disarmament as a consequence for criminal conduct.

We agree with defendant that some of these early American disarmament measures were likely motivated, at least in part, by a fear of armed insurrection, but collectively their purpose was surely broader. Otherwise, there would have been no need to disarm members of pacifist sects like the Quakers or Moravians, or to punish nonviolent political and religious dissenters like Richard Barnes and the followers of Anne Hutchinson. Also, New York's 1656 law aimed at " 'Indians with a gun' " was expressly justified by its perceived utility in preventing " 'isolated murders and assassinations.' " (Greenlee, *supra*, 20 Wyo.L.Rev. at p. 262, fn. 76.) And a person could be convicted under the going armed laws without harboring any insurrectionary intent. Taken together, this historical evidence shows that individuals were disarmed as a preventative measure when the law assessed they were unwilling to respect sovereign authority, *and* they were

25

disarmed as a sanction for criminal conduct, whether or not involving physical violence. California's felon disarmament measures are " 'relevantly similar' " in serving both of these purposes. (*Rahimi, supra*, 602 U.S. at p. __ [144 S.Ct. at p. 1898].)

Also, section 29800 imposes a similar burden on the right to arms as do these historical analogues. As with the categorical disarmament laws, section 29800's deprivation of rights is complete for those assessed unwilling to respect sovereign authority, but the statute does not "restrict arms use by the public generally." (*Rahimi, supra*, 602 U.S. at p. __ [144 S.Ct. at p. 1901].) As with the criminal penalty of disarmament, section 29800 deprives an individual of weapons only after he or she has been convicted in a court of law, with all the attendant protections of due process. And while defendant is correct that, historically, disarmament as a criminal penalty was sometimes temporary, this appears not always to have been the case. (See Konig, *supra*, 26 Am. J. of Legal Hist. at p. 371.) In any event, categorical disarmament laws imposed permanent prohibitions (at least while the laws themselves lasted).

We emphasize, categorical disarmament laws are not inconsistent with the Second Amendment. The legal tradition that traces back to the English Bill of Rights anticipates legislatures will regulate the right to arms; in particular, it anticipates legislatures will entirely prevent some members of the community from exercising the right. (*Heller, supra*, 554 U.S. at pp. 592–593.) Supreme Court precedent confirms that regulation may take the form of a categorical ban on certain individuals possessing firearms. (*Id.* at pp. 626–627; *Rahimi, supra*, 602 U.S. at p. __ [144 S.Ct. at p. 1896].) "That *some* categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details." (*Skoien, supra*,

614 F.3d at p. 640.) As courts scrutinize those details, the analogical reasoning required to justify regulation of activity presumptively protected by the Second Amendment is not "a regulatory straightjacket." (*Bruen*, *supra*, 597 U.S. at p. 30.) Courts should not endorse " 'outliers that our ancestors would never have accepted,' " but beyond that, "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." (*Ibid.*, italics omitted.)

Here, the government has not only identified such historical analogues, it has also produced evidence in the form of proposals from the Pennsylvania and Massachusetts ratifying conventions, that our "ancestors" in the law would have accepted a statute disarming persons convicted of felony conduct. We reject defendant's argument that Pennsylvania's and Massachusetts's proposals are unpersuasive because they were not adopted by the states' ratifying conventions. That argument misunderstands the dynamic of those debates. What both states voted down in their conventions was the idea that the federal Constitution should only be ratified if amended to include a declaration of rights. (Schwartz, pp. 627–628.) Among those rights was the right to arms we have discussed, but there is no evidence that the precise formulation of that right was itself controversial. Review the many pages of records available from the Pennsylvania ratifying convention, and you will find no disagreement with the articulated proposition that the right to arms with which the delegates were familiar had an exception, allowing disarmament for "crimes committed" or to protect the community against "danger of public injury." (Schwartz, pp. 627–673.) And, of course, after the Constitution was adopted the Pennsylvania Antifederalists won their declaration of rights with the adoption of our Bill of Rights, including the Second Amendment.

27

We read the evidence from the Pennsylvania and Massachusetts ratifying conventions as confirming what the historical analogues have already established:  that this nation's tradition of firearm regulation allows for a categorical ban on the possession of firearms by persons who have been convicted of a felony.  Because section 29800 passes constitutional muster on this basis, so too does section 30305; it merely extends section 29800's prohibition on felons possessing firearms to prevent felons also from possessing ammunition.  Defendant makes no separate argument aimed at the constitutionality of section 30305.

Finally, we note that *Rahimi* offers one more lesson dispositive of this case.  *Rahimi* reminds us that a facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.' " (*Rahimi, supra,* 602 U.S. at p. __ [144 S.Ct. at p. 1898], citing *United States v. Salerno* (1987) 481 U.S. 739, 745; see also *Moody v. NetChoice, LLC* (2024) 602 U.S. __ [144 S.Ct. 2383, 2397].)  Because the challenge before us is a facial challenge, "to prevail, the Government need only demonstrate that [the statute] is constitutional in some of its applications." (*Rahimi*, at p. __ [at p. 1899].)  And in this case, as in *Rahimi*, "the provision is constitutional as applied to the facts of [defendant's] own case." (*Ibid*.)  Defendant had prior convictions for felonious conduct involving moral turpitude on three separate occasions:  one for maliciously and intentionally shooting at an inhabited dwelling or motor vehicle (§ 246); one for assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1)); and one for being a felon in possession of a firearm (§12021, subd. (a)(1)).  We have no trouble concluding that in the

founding era, he could have been disarmed as punishment for at least one of these crimes.[3]

## C. Carrying a Concealed Weapon in Public

We turn next to defendant's conviction for violating section 25400(a)(2), which prohibits a person from carrying a concealed firearm on the person. Although section 25400 appears "broadly prohibitory," it is part of a statutory scheme that contains "numerous express exemptions." (*In re T.F.-G.* (2023) 94 Cal.App.5th 893, 908, 915 (*T.F.-G.*).) Pertinent here, section 25400 does not apply to a person who is licensed to carry a concealed weapon under California law. (§ 25655; *People v. Miller* (2023) 94 Cal.App.5th 935, 939–940 (*Miller*).) Defendant did not have, and as a felon was not eligible to obtain, a license to carry a concealed weapon. (See § 29800.)

At the outset, we briefly address a provision of California's licensing scheme that is *not* at issue, the provision that until recently required an applicant to show that "good cause exists" for issuance of a concealed carry license. (former §§ 26150, subd. (a)(2), 26155, subd. (a)(2); both amended by Stats. 2023, ch. 249, §§ 10 & 11, respectively.) California appellate courts have held that this "good cause" licensing requirement violates the Second

---

[3] Indeed, because criminal punishment in early America was, by contemporary standards, draconian, disarmament would likely not have been the worst of the sanctions defendant would have faced. (See, e.g., *Medina, supra,* 913 F.3d at p. 158 ["at the time of the Second Amendment's ratification, nonviolent crimes such as forgery and horse theft were capital offenses"]; *United States v. Coombes* (2022) 629 F.Supp.3d 1149, 1163 [colonial-era statutes made burglary and larceny punishable by mutilation and/or death]; but see *Kanter, supra,* 919 F.3d at p. 459 (dis. opn. of Barrett, J.) ["property crimes including variations on theft, burglary, and robbery 'were, on the whole, not capital' "].) Ambiguities aside, this evidence supports that the founders likely would not have viewed a firearm-possession ban as unduly severe punishment for commission of a felony. (*Medina,* at p. 158; *Rahimi, supra,* 602 U.S. at p. __ [144 S.Ct. at p. 1902].)

Amendment because it is substantively similar to the "proper cause" licensing requirement found unconstitutional in *Bruen*. (See, e.g., *People v. Mosqueda* (2023) 97 Cal.App.5th 399, 408.) However, our courts have also repeatedly held that the "good cause" provision is severable, and that *Bruen* did not invalidate other provisions of California's licensing law. (*Mosqueda*, at pp. 409–412; *In re D.L.* (2023) 93 Cal.App.5th 144, 163–165; *T.F.-G, supra*, 94 Cal.App.5th at p. 916.) If, in his opening brief, defendant relies on the now-invalid "good cause" licensing requirement to challenge his conviction for carrying a concealed firearm, he abandons that claim in his reply brief.

Instead, defendant's reply grounds his Second Amendment challenge to section 25400 on his status as a convicted felon. Defendant's theory is as follows: California prevents people in his position from obtaining a license to carry a concealed weapon lawfully—indeed, prevents them from carrying any firearm at all, due to their prior felony conviction. (§ 29800.) Therefore, to the extent section 29800 violates the Second Amendment, a felon's conviction for carrying a concealed firearm without a license must as well.

We have already rejected defendant's premise that section 29800 is unconstitutional, and on that basis we reject this argument as well. We need not address other potential flaws in defendant's challenge to the concealed carry law. (See e.g., *Miller, supra*, 94 Cal.App.5th at pp. 943, 945–946 [constitutionality of concealed carry prohibition is not dependent on valid licensing scheme].)

## II. Jury Deliberations

Defendant contends that even if his Second Amendment claims fail, the judgment must be reversed because the trial court violated his due process rights by instructing the jury to continue deliberations after the jury

30

indicated they were deadlocked as to one of the charges. To address this challenge, we need a fuller understanding of the facts of the case.

## A. Additional Background

### *The Prosecution Case*

In the early hours of November 10, 2019, a desk clerk at the Berkeley City Club heard gunshots, looked out a window, and saw defendant walking up Durant Avenue. When the clerk stepped outside, he saw defendant walking away from the club's garbage cans, where police later found a semiautomatic pistol with an empty magazine. Police also found shell casings on the street outside Kip's Bar on Durant, and collected bullet fragments nearby. A criminalist concluded that the casings and fragments were all fired from the gun that was recovered from the garbage can.

Police also obtained surveillance video from security cameras in the vicinity. From those videos, police identified defendant as the shooter. There was footage of defendant standing in the street outside Kip's, dressed in all white clothing with his right hand extended. Immediately after defendant lowered his hand, another individual ran away. Then defendant ran from the scene, with a firearm in his hand.

Video evidence showed that after defendant left the scene of the shooting, he was accosted by a group of unknown assailants. Surveillance footage from a nearby street recorded a dark car following defendant to a parking lot, where people got out of the car and assaulted him, and one of them rummaged through his pockets.

A few days after the shooting, police interviewed Jason Jones, who subsequently testified at defendant's trial. Jones testified that on the night of November 9, 2019, he drove defendant to a bar in downtown Berkeley where they met up with their friend Anthony Farr and another man. When

31

the bar closed, Jones went to move his car, to park it near Farr's car on Durant, a few car-lengths down from the entrance to Kip's. While Jones and defendant waited for Farr and the other friend, Jones noticed a large group outside Kip's and an altercation of some kind, but he and defendant did not get involved.

Jones testified that by around 2:30 a.m. Farr and his friend had returned, and their group decided to leave Berkeley. When Farr started driving away, Jones was talking to a woman on Durant, and defendant was somewhere in the vicinity. Then Jones heard glass breaking, and saw defendant run toward a group of people who had congregated on the corner where Farr's car had stopped. Jones walked up the other side of the street, saw that a rear window of Farr's car had been broken, and observed a crowd of 10 or 15 people. Farr quickly drove away, and the group headed toward Jones, who turned and ran. As he was running to his car, Jones heard four gunshots and saw defendant take off running. Before Jones drove away from the scene somebody broke his car window. Jones testified that he looked for defendant before he drove away but did not see him.

At trial, Jones testified that he did not believe defendant had anything to do with the gunshots. However, when the police interviewed Jones a few days after the incident, he told them that he thought defendant was involved in the shooting. Jones told an officer that when defendant started running to Farr's car, Jones screamed for him to leave, but defendant " 'got pissed off' " that the crowd had thrown something at Farr's car and " 'ran towards' " the incident even though it had nothing to do with him. Jones also said that he had been concerned in the moment about defendant getting back into his car because he thought defendant had something to do with the gunshots. When the officer asked why Jones thought defendant was involved, Jones

explained: " '. . . he ran towards the funk.  He ran toward the f\*cking bull shit.' "

Ten days after the shooting, defendant was arrested, advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, and questioned by police.  Defendant confirmed he was in Berkeley in the early morning of November 10, and that he wore a white tracksuit.  He told the police that after the bars closed, he spent time talking to a girl and then took a cab home.  During the interview, the officer told defendant that he fit the description of a person who had been seriously injured that night, and asked about defendant's well-being.  Defendant said he was good and denied that he had been in an altercation of any kind.

### The Defense Case

The defense theory at trial was that defendant inadvertently shot Christopher B., firing Jones's gun in an act of self-defense.  Defendant's DNA expert testified that both Jones and defendant contributed to DNA she found on the gun recovered from the garbage can.  And the defense elicited testimony from a friend of the victim to support their theory—set forth in defendant's own testimony—that someone other than defendant also used a gun during the incident.  Jonathan R., a friend who was with Christopher when the shooting occurred, told police at the scene that there were two shooters.  At trial, however, Jonathan testified that he had thought there were two shooters because of the number of shots fired and the pauses he heard in between shots, but he did not see two shooters, or indeed anyone with a gun.

Testifying in his own defense, defendant recalled mingling with people on the street after the bars closed and then going to Jones's car to wait for his friends.  He told the jury he was in Jones's car waiting for Farr when he first

noticed a gun wedged between the driver's and passenger's seats. Defendant testified he had thought it was a bad idea for the gun to be out in the open, so he put it in his pocket, intending to put it in the trunk before they drove away. Then when Farr arrived, he and Jones got out of the car to talk about what they would do next. After Farr and his friend drove off, defendant was about to get into Jones's car, when Jones told him somebody had thrown a bottle at Farr's car.

Defendant testified that he ran to see if his friend was alright, and when he reached the corner he saw Farr drive away. Then defendant noticed a group of people in the middle of the street and started to back away from them. One of two men who stood at the front of the group asked defendant what he was going to do, which defendant interpreted as an invitation to fight. The second man stood just behind the first, with a gun in his hand. Backing away, defendant pulled the gun out of his pocket and pointed it at the man with the gun because he did not want to get shot. Another man from the group said "pop that n*gger" three times while defendant continued to back up and away from the crowd. After the third time, defendant "fired shots in that direction and then turned [and] ran out of there."

Defendant testified that he had never fired the gun before that night, and he did not think "anyone was shot." He threw the gun in a garbage can because he did not want to get caught with it. Then he ran toward a BART station, intending to get a cab. But he noticed a black car was following him and recognized the occupants as the people from the street corner. He turned and "ran back to try to hide," but then got "jumped" and was beat "pretty bad." Defendant was not sure how long he was "knocked out," but he remembered getting up and stumbling around the corner, where someone helped him get a cab. His phone, keys and money were gone, but his wallet

was still in his back pocket.  Defendant testified that he did not call the police because he does not "trust the police."

Defendant acknowledged that when police interviewed him in November 2019, he claimed not to know anything about the shooting incident, despite his belief that he had done nothing wrong by acting in self-defense.

### *Jury Deliberations*

Jury deliberations began on the afternoon of June 30, 2022, lasted for approximately one hour, and continued the next day, which was a Friday. Then, after a holiday recess, the jury resumed deliberating on July 6, and at 11:45 a.m., informed the bailiff they had reached verdicts.  Once the parties and jurors were present in court, the court inquired of the foreperson (Juror 11) whether the jury had reached a verdict as to all issues.  Juror 11 reported the jury had reached verdicts on three of the four counts.

The court inquired about any votes the jury had taken regarding the remaining count.  Juror 11 reported they had had three ballots, and the most recent result had been ten for one position, one for a different position, and one undecided.  These numbers had changed since the first ballot when the votes were seven for one position and five undecided.  The court inquired if there was something the court could do to assist the jury in reaching a verdict, such as providing further instruction or further argument of counsel on some point.  Juror 11 responded, "I don't think so," explaining that the jury had tried to come up with a question to ask, but could not "come up with anything."  When the other jurors were asked if they disagreed, nobody raised a hand.  The court asked if the jury believed they were "hopelessly deadlocked."  Juror 11 said yes, and again the others appeared to concur.

After a break to confer with counsel, the court asked which count had not been decided. Juror 11 responded that it was count 1, the felony assault charge. Then the court gave the following instruction:

> All right. So it may seem like you've been across the hall forever and ever, but I'm going to direct you to continue your deliberations. You've only been deliberating for less than two days. I know when we first met I indicated that I did not want to comment on how long deliberations should last, but I will say that less than two days is not an unusually long period of time by any means.
>
> I'm also encouraged by the idea that there has been movement in the polling which suggests to me that the discussions have been helpful in moving towards unanimity on the [undecided count].
>
> So with that I'll have you take your lunch break and resume your deliberations at 1:30. Then you can—if you at all reconsider my offer if there's something that you think I can do to be helpful I'm available. Just send me a note about that and then we'll check in again this afternoon. [¶] Thank you.

Deliberations resumed and less than 30 minutes later, the jury submitted a note requesting "additional input, clarification, or evidence" regarding the requirements for self-defense, specifically, the elements of imminent danger of injury; the need for immediate force: and that there be no more force than necessary. The court provided a response orally and in writing, which addressed these concepts and then permitted both parties to present additional argument. The jury resumed deliberations, and about 15 minutes before the evening recess, they submitted another note requesting clarification as to whether "physical distance is a factor in deciding immediacy and imminence."

When the jury reconvened the next morning, at around 9:30 a.m. on July 7, the court provided a written response to the pending question. At 10:40 a.m., the jury indicated it had a verdict.

36

**B. Analysis**

" 'The decision whether to declare a hung jury or order further deliberations rests in the trial court's sound discretion.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 88 (*Brooks*).)  Section 1140 codifies the general rule that, absent the consent of both parties, a "jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court," unless "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.)  Relatedly, the California Rules of Court suggest measures for a court to take after receiving a report of a jury impasse, and decisions about whether and how to employ these tools are also reviewed for abuse of discretion.  (*People v. Salazar* (2014) 227 Cal.App.4th 1078, 1088; see Cal. Rules of Court, rule 2.1036.)

"Whether a trial court has improperly coerced a jury is a separate, albeit related inquiry from whether the court abused its discretion under section 1140." (*People v. Thomas* (2023) 14 Cal.5th 327, 403 (*Thomas*).)  The California Constitution empowers a court to comment on the evidence in order to assist the jury in reaching a just verdict.  (*People v. Proctor* (1992) 4 Cal.4th 499, 541–542; Cal. Const., art. VI, § 10.)  However, the "court must exercise its power without coercion of the jury so as to avoid displacing the jury's independent judgment ' "in favor of considerations of compromise and expediency." ' " (*Thomas*, at p. 403.)  "Coercion involves ' "a judicial attempt to inject illegitimate considerations into the jury debates [and] . . . appeal to dissenting jurors to abandon their own independent judgment of the case against the accused," ' by exerting ' "excessive pressure on the dissenting jurors to acquiesce in a verdict." ' " (*Ibid*.)  We examine the record to determine whether the trial court "impose[d] such pressure on jurors to reach

37

a verdict" as to leave us "uncertain of the accuracy and integrity" of the verdict. (*People v. Gainer* (1977) 19 Cal.3d 835, 850, disapproved in part on other ground in *People v. Valdez* (2012) 55 Cal.4th 82, 163 (*Valdez*).) " '[A]ny claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case.' " (*Brooks, supra,* 3 Cal.5th at p. 88.)

We find no coercion under the circumstances presented here. When the foreperson first disclosed that the jury had not reached a verdict on count one, the court's inquiry concerning the jurors' numerical division was an appropriate method of determining whether additional deliberations would likely be productive. (*Thomas, supra,* 14 Cal.5th at p. 404; *Brooks, supra,* 3 Cal.5th at p. 92.) Moreover, the jurors' own doubt about their ability to reach a verdict did not supplant the trial court's discretion under section 1140 to order further deliberations based on its view that the jury had not deliberated for a sufficient about of time, given the length of the trial and complexity of the legal issues. (*Valdez, supra,* 55 Cal.4th at p. 160.)

On appeal, defendant concedes the court's initial inquiry regarding the status of the deliberations was proper but contends the court made "two critical errors" that "coerce[d] the jury to reach a verdict." First, it asked the jury to disclose which count had not been decided, and then it allegedly encouraged the jury to reach a verdict based on the majority view.

To the extent this first alleged error is intended as an independent basis for reversing defendant's conviction on count one, the argument was not preserved for appellate review. In the trial court, the defense opposed ordering the jury to continue deliberating but did not object to asking which count it had been unable to decide. (See e.g., *People v. Schultz* (2020) 10 Cal.5th 623, 667–668 [general objection to evidence did not preserve specific constitutional claim raised for first time on appeal].) In any event, defendant

cites no authority suggesting it was improper for the trial court to ask this question, and the answer seems relevant to the trial court's task "to determine if, despite the report of a stalemate, there is a reasonable probability of future agreement." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 462 (*Bryant*).)

The second alleged error comes closer, but ultimately we disagree with defendant's factual contention that the trial court signaled it wanted the jury to reach a verdict consistent with the majority view. To be sure, the court stated that movement in the polling was encouraging because it suggested the jury's "discussions ha[d] been helpful in moving towards unanimity." But the court did not express any opinion about whether unanimity should ultimately prevail, nor did it encourage any specific faction of the jury to change its view one way or another. As in *Bryant*, where a jury began evenly split and moved gradually to 11 to one, the trial court's "mention of the jury's progress explained the court's direction to continue deliberations" without encouraging "any juror to reevaluate a position or push[ing] for any verdict." (*Bryant, supra,* 60 Cal.4th at pp. 459, 463.) As in *Bryant*, the trial court failed to include an instruction reminding "jurors not to give up their position simply for the sake of reaching a verdict." (*Id*. at p. 462.) An instruction of this sort has been recognized as a best practice, included in a pattern instruction promulgated by the Judicial Council of California. (See CALCRIM No. 3551 ["It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. Both the People and the Defendant are entitled to the individual judgment of each juror"].) But the absence of such a reminder did not fatally undermine the

verdict. (*Bryant*, at p. 462; see also *People v. Debose* (2014) 59 Cal.4th 177, 210 [distinguishing federal rule].)

Defendant argues otherwise based on *Jimenez v. Myers* (9th Cir. 1994) 40 F.3d 976 (*Jiminez*), a case that is not binding and is factually distinguishable. In *Jiminez*, the jury deliberated for approximately five hours and then sent the court a note stating that it was unable to reach a verdict. (*Id*. at p. 978.) In response to the court's inquiry, the foreperson reported that the numerical vote was nine to three, that five or six votes had been taken, and that the movement had been in one direction. The jury was informed that this movement was important to the court, given the nature of the case and, after a three-day weekend, the jury resumed deliberations. Three hours later, the jury sent another note, again stating it was at an impasse. (*Ibid*.) Counsel for both parties agreed the jury was hung and the matter should be retried. Instead, the court questioned the jury again, eliciting information that the numerical division was now 11 to one. Then the court instructed the jury to deliberate for the rest of the day, "[d]ue to the fact we have had that type of movement." (*Id*. at p. 979.) Less than two hours later, the jury returned a verdict convicting the defendant of attempted murder. (*Ibid*.)

A federal appeals court granted the *Jiminez* defendant habeas relief, concluding that the trial court gave a "de facto *Allen* charge" by instructing "the jurors to work towards unanimity and the minority to reexamine its views." (*Jiminez*, *supra*, 40 F.3d. at p. 980; see *Allen v. United States* (1986) 164 U.S. 492.) The *Jiminez* court reasoned as follows: "In view of the disclosure after the second impasse that only one juror remained in the minority and the trial court's implicit approval of the 'movement' toward unanimity, the court's instruction to continue deliberating until the end of

40

the day sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity." (*Id*. at p. 981.)

We are "not bound by the decisions of the federal appellate courts, although they may be considered for their persuasive weight." (*Brooks*, *supra*, 3 Cal.5th at p. 90.) This particular federal precedent the California Supreme Court has three times declined to follow, once declaring itself "not persuaded by the court's view in *Jiminez v. Myers*. . . ." (*Bryant*, *supra*, 60 Cal.4th at p. 462), and twice declining to decide whether *Jiminez* was persuasive because the case before it could be factually distinguished (*Brooks*, at p. 90; *Thomas*, *supra*, 14 Cal.5th at p. 404).

The case before us is likewise factually distinguishable from *Jiminez*. Here, there was no second impasse and no agreement between the parties to declare a mistrial, and the trial court's remarks were not inherently coercive. When Juror 11 disclosed that a verdict had not been reached as to one count, the court inquired about the numerical breakdown in a neutral manner, which is permissible under California law. (*Valdez*, *supra*, 55 Cal.4th at p. 160 [upholding practice of inquiring into " 'numerical division' of a jury that has declared itself unable to reach a verdict, without finding how many jurors are for conviction and how many are for acquittal"].) The court's response to this information encouraged all jurors to attempt to reach a verdict in the sense that it reminded them their discussions had been fruitful thus far, but the court did not express any view as to what the outcome of further discussion should be. The court did not state or imply that jurors in the minority should abandon their own independent judgment. Instead, the court offered to be available in case it could assist the jury, and when the jury

41

soon identified particular concerns regarding the requirements for self-defense, the court provided additional instruction and arranged for supplemental oral argument.

We note that defense counsel used the opportunity for supplemental argument to remind the jury they were not required to reach a verdict: "If you can't reach that verdict based on this additional information you're not obligated to. And the last thing I think anybody here would want is somebody to feel peer pressure, or pressure from the Court, or pressure from the lawyers to reach a unanimous verdict. . . each person should make an individual decision based on what you've heard from our arguments and the Court's clarification." These remarks echoed the message the court had delivered, when it instructed the jury at the outset of deliberations in accordance with CALCRIM No. 3550. Each juror "must decide the case for yourself, but only after you have discussed the evidence with the other jurors," and "change your mind if you become convinced that you are wrong[, b]ut do not change your mind just because other jurors disagree with you," the court had instructed.

Unlike defendant, we do not consider the amount of time the jury deliberated excessive for the complexity of the self-defense issue they had to decide, and in light of all the circumstances we conclude the trial court did not coerce the jury into rendering its verdict.

## III. Sentencing Issues

Defendant's final set of contentions pertains to his aggregate 19-year prison sentence. He contends that the trial court erred by (1) failing to dismiss sentence enhancements in light of his diagnosis of Post-Traumatic Stress Disorder (PTSD) and other mitigating factors; (2) failing to dismiss his prior strike conviction in the interests of justice; and (3) failing to stay his

sentence for unlawful possession of ammunition. Generally, sentencing errors are reviewed for an abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) However, claims of legal error in sentencing are reviewed de novo. (*People v. Superior Court* (*Frezier*) (2020) 54 Cal.App.5th 652, 659.)

## A. Additional Background

Before defendant's sentencing hearing, which was held on September 9, 2022, the court received a probation report, the parties' sentencing memoranda, and a lengthy filing of evidence submitted on behalf of defendant.

### *The Probation Report*

The probation report summarizes defendant's extensive criminal history and the information he provided when interviewed by the probation officer. Defendant reported that he had a stable upbringing and no family history of substance abuse or mental health issues, except that his mother was largely absent from the home due to her drug addiction. Defendant stated that he graduated from college, worked as a barber, and was coparenting three children. He also reported he had recently been diagnosed with PTSD while in jail but was not taking medication.

The probation officer reported that defendant was statutorily ineligible for probation, absent unusual circumstances, and identified multiple aggravating circumstances: the current offense involved a threat of great bodily harm; defendant was armed and used a weapon; he engaged in violent conduct indicating "a serious danger to society"; his prior convictions are numerous and of increasing seriousness; he served a prior prison term; he was on federal probation when he committed the current offense; and his prior performance on probation was unsatisfactory.

43

### *Sentencing Memoranda*

The People requested that the court sentence defendant to an aggregate term of 25 years to life. Regarding aggravating factors, the People emphasized defendant's prior violent crimes, which include a strike conviction for shooting a gun at an inhabited dwelling, and the fact that defendant was on felony probation for being a felon in possession of a firearm when he committed the current offenses. The People objected to using defendant's PTSD diagnosis as a mitigating factor, contending that the doctor who evaluated defendant had based his diagnosis on a self-reported questionnaire and that defendant was not a credible reporter.

Defendant, in his sentencing memorandum, requested the following relief: (1) dismissal of his prior strike conviction; (2) dismissal of all sentencing enhancements; (3) a stay of sentence as to either the assault conviction or all firearm offenses; and (4) a low or middle term for any unstayed sentence. Defendant argued that mitigating factors were paramount. In addition to his stable family and work history, defendant relied on evidence he had been diagnosed with PTSD by Dr. David M. Joseph, a clinical psychologist who evaluated him prior to trial. The defense argued that the connection between defendant's current offenses and his PTSD diagnosis was established by evidence attributing his PTSD to prior extensive exposure to gun violence, both as a witness to a brutal shooting and as a victim of shootings that occurred on two other occasions. Defendant attached multiple documents to his sentencing memorandum, including two reports by Dr. Joseph.

Dr. Joseph's April 2022 report summarizes the results of defendant's psychological evaluation, which Joseph conducted by "using an online platform at the Alameda County Public Defenders' office." Defense counsel

44

was present during the evaluation, which included completing a 20-item self-report questionnaire during an interview.  Joseph's report includes a summary of defendant's history of trauma, which describes three incidents defendant reported:  In 1996, he witnessed the shooting death of a friend when two gang members opened fire in a crowded plaza at a college campus.  In about 2005, he was shot in the back while struggling with a man who tried to rob him at a BART station.  And in 2018, he was shot in the leg by the boyfriend of a women with whom defendant had a verbal altercation while waiting in line at a taco truck; defendant then lost consciousness and crashed his car, with his children in it, while driving to the hospital.  Joseph reported that defendant had trouble articulating how these experiences affected him, but he did report ongoing psychological symptoms.  On his self-report questionnaire, defendant's overall score was "just above the cutoff for PTSD, which makes a diagnosis of PTSD likely," Joseph opined.  In this report Joseph also opined that defendant's diagnosis and history "may have" affected his behavior on the night of Christopher B.'s shooting, as PTSD can affect a person's threat assessment, diminish executive function, and impair emotional regulation.

Dr. Joseph also prepared a July 2022 supplemental report addressing follow-up questions defense counsel asked about defendant's threat perception and response during the 2019 shooting.  In requesting this follow-up, counsel provided Joseph with a summary of trial testimony consistent with defendant's self-defense theory.  Joseph's supplemental report states that crimes defendant himself committed twenty years earlier "had no impact on [Joseph's] understanding" of defendant's PTSD because defendant's condition appeared to be linked to other traumatic events and, as far as Joseph knew, defendant committed no other violent offenses after 1999.

Joseph's supplemental report also states, "[i]t is reasonable to conclude" defendant's prior exposure to violence (including his own) and traumatic experiences "substantially impacted his perception of threat and his decision making in 2019." In particular, the "fact that he had PTSD would very likely have exacerbated the intensity of this threat response while inhibiting his executive functioning and compromising his decision making."

### *Defendant's Sentence*

During the sentencing hearing, the trial court heard and engaged with lengthy arguments from both counsel. After the matter was submitted, the court began by addressing aggravating and mitigating circumstances. The court stated it would not rely on the aggravating factors that defendant inflicted great bodily injury and used a weapon during the current offenses, as those were separate enhancements. However, it found the presence of other aggravating circumstances, including that defendant had a prior prison term, was on probation when he committed the current offenses, and had performed unsatisfactorily on probation. Moreover, the court concluded, there were no mitigating circumstances "as described [in] the Rules of Court." The court then chose the midterm sentence of six years for the felony assault conviction, as the prosecutor requested.

As regards the two sentencing enhancements associated with the assault conviction, the court denied defendant's request to strike these in the interests of justice pursuant to section 1385. First, the court found no "substantial connection" between defendant's mental health history and his actions in the current case: "I think he was carrying that weapon around, for whatever reason. I think he's got a history of carrying weapons around that he shouldn't be carrying. He certainly has a history of using them in very violent ways. And I think all of that is without regard to any previous

46

instances in which he has been a victim." The court found defendant "didn't need to" involve himself in the conflict on the street, as there was no imminent danger posed by somebody throwing a bottle at a car. More broadly, the court found that "dismissal of any of these enhancements is not required despite the 'shall' " language of section 1385, subdivision (c) because defendant "is a danger to the public," as demonstrated by the facts of this case and his criminal history. The court found, echoing the language of the statute, "there's a likelihood a dismissal of enhancement will result in physical injury or serious danger to others," so it was not in the interests of justice to dismiss the enhancements associated with the assault conviction.

The court also declined to exercise its discretion to strike defendant's prior strike, emphasizing defendant's criminal history and repeated unlawful possession of firearms, and the potential danger associated with his unlawful use of a firearm in the current matter. It did, however, strike defendant's prior serious felony enhancement.

In pronouncing defendant's sentence, the court used the assault conviction as the base term and imposed a 19-year sentence as follows: a middle term doubled to 12 years because of the strike prior, with an additional three years for the great bodily injury enhancement and four years for the gun use. The court imposed concurrent four-year terms for possession of a firearm and possession of ammunition, declining to stay either sentence under section 654. It did stay a four-year sentence for carrying a concealed weapon, however, and imposed fines and fees that are not at issue on appeal.

**B. Sentence Enhancements Associated with Assault Conviction**

Section 1385 addresses "mitigating circumstances that the trial court should consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Lipscomb* (2022) 87

47

Cal.App.5th 9, 16; § 1385, subd. (c) (§ 1385(c)).)  Section 1385(c) provides that a sentencing court "shall dismiss" a sentence enhancement "if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute."  (§ 1385(c)(1).)  Section 1385(c) further provides that in "exercising its discretion . . ., the court shall consider and afford great weight to" nine mitigating circumstances listed in the statute, and that "[p]roof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (§ 1385(c)(2).)

Here, with respect to defendant's assault conviction, the trial court imposed consecutive terms for personal use of a firearm and personal infliction of great bodily injury.  Contending that both enhancements should have been stricken, defendant argues that three mitigating circumstances listed in section 1385(c) apply to him.

The first circumstance is that "[m]ultiple enhancements are alleged in a single case.  In this instance, all enhancements beyond a single enhancement shall be dismissed," according to one portion of the statute. (§ 1385(c)(2)(B).)  Although section 1385(c)(2)(B) uses the phrase "shall be dismissed," this provision does not constitute a mandatory rule of automatic reversal because courts do not construe statutory language in isolation. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 295–297 [construing parallel language in section 1385(c)(2)(C)]; see also *People v. Walker* (Aug. 15, 2024, No. 278309) __ Cal.5th __ [2024 Cal.Lexis 4426, *11] [section 1385(c)(2) does not "erect a rebuttable presumption in favor of dismissal that can only be overcome by a finding that dismissal endangers public safety"].)  Courts must consider the language of a statute in the context of the statute as a whole, and the overall statutory framework.  (See e.g. *People v. Valencia* (2017) 3

Cal.5th 347, 358.) Here, as we have noted, section 1385(c) preserves the court's discretion to decide whether dismissing an enhancement will be in the interests of justice by requiring the court to consider and weigh multiple factors. This statutory procedure would be largely superfluous if a single mitigating factor were outcome determinative. Moreover, section 1385(c)(2) requires the court to consider whether dismissal of an enhancement "would endanger public safety," in which case the court need not consider the listed mitigating factors at all. (*Mendoza*, at pp. 296–297.)

This is the basis on which the trial court refused to strike either of the two enhancements here, finding a likelihood that dismissal would "result in physical injury or serious danger to others." Defendant contends this was error, as defendant would likely be in his mid- to late-fifties when released from custody if one of the enhancements was dismissed, and criminality " ' "declines drastically after age 40 and even more so after age 50." ' " (Quoting *In re Stoneroad* (2013) 215 Cal.App.4th 596, 634, fn. 21.) We disagree that these statistics establish the trial court abused its discretion. The court relied on the facts of this case, when an innocent person could easily have been killed as a result of defendant's conduct, and on defendant's history of perpetrating gun violence and illegally carrying firearms. In light of the fact defendant was already over 40 years old when he committed these most recent crimes, we see no error in the trial court's reliance on public safety in refusing to strike the enhancements.

Defendant argues that the trial court was required to strike the enhancements on the basis of two other mitigating factors: that "[t]he current offense is connected to mental illness" (§ 1385(c)(2)(D)); and that "[t]he current offense is connected to prior victimization or childhood trauma" (§ 1385(c)(2)(E)). But the trial court's finding with regard to public safety

was a sufficient basis for the court not to have stricken the enhancements in spite of any mitigating factors, including these. Moreover, the trial court found defendant's current offenses were *not connected* to mental illness or prior victimization. Acknowledging that prior gun violence can cause PTSD, the court nonetheless rejected the evidence that defendant's current offenses were connected to PTSD because Dr. Joseph's opinions were premised on defendant's version of events, and the court found defendant was not credible. The court's finding is supported by the record, which shows, among other things, that when defendant was interviewed by police shortly after the incident, he claimed he was not involved in an altercation of any kind, and then he changed his story at trial to offer a new and uncorroborated version of events that was favorable to himself. (See *People v. Tully* (2012) 54 Cal.4th 952, 979 [reviewing court " 'must accept trial court's resolution of disputed facts and its assessment of credibility' "].) Defendant fails to show any abuse of discretion in the trial court's ruling, instead making three flawed arguments.

First, defendant faults the court for relying "heavily" on his prior strike conviction for a "violent gun offense" without considering that he was only 21 when he committed that crime, his "brain was not fully developed," and his "impulse control, judgment, and thought processes" were accordingly deficient. Defendant forfeited this argument by failing to raise it at the time of sentencing. (*People v. Pearson* (2013) 56 Cal.4th 393, 416.) In any event, it was the defense that made an issue of defendant's prior involvement with gun violence by urging this as a basis for mitigation. The court inquired about defendant's weapon-related convictions as a counterpoint to his evidence of prior victimization, pointing out that in 1999, defendant's "angry weapons-related shooting up of a house with people sitting on the porch,"

50

resulted in the prior strike conviction; that defendant possessed a weapon again in 2008; and that he suffered a federal conviction for weapon possession before committing the current offenses, which had him "out on the streets of Berkeley in a bar with a weapon on him." Defendant fails to show any abuse of discretion in the court's brief review of defendant's prior gun-related offenses.

Defendant next argues that the court's "wholesale" rejection of defendant's expert evidence was error because the expert evidence was uncontroverted. But the trial court did not reject out of hand the expert evidence. It considered the PTSD diagnosis but remained unconvinced that the current offenses were related to PTSD. In any event, "expert testimony, even if uncontradicted, is not binding on the trier of fact, and may be rejected, especially where experts are asked to speculate about a defendant's state of mind at the moment the crime was committed." (*People v. Green* (1984) 163 Cal.App.3d 239, 243.) Defendant cites *In re R.V.* (2015) 61 Cal.4th 181, which is clearly inapposite. In that juvenile wardship matter, the weight and character of a court-appointed expert's opinion that the minor was not competent to stand trial was such that the juvenile court could not reasonably reject it. (*Id*. at p. 186.) Nothing comparable happened here.

Defendant's third argument is that the trial court relied on irrelevant or improper factors to conclude that defendant's conduct was not connected to his PTSD. For example, defendant contends the court based its ruling on a determination that defendant did not really find the gun in Jones's car but possessed it throughout the evening. This was error, defendant posits, because regardless of when he first possessed the gun, his prior victimization and mental health issues were factors in his decision to use it. This argument misconstrues the record. During the sentencing hearing, defense

51

counsel argued that Dr. Joseph's expert opinions linking the current offenses to defendant's PTSD were supported by defendant's own trial testimony that he acted in self-defense. The trial court rejected this argument because he found that defendant was not credible, and when defense counsel disputed this finding, the court used defendant's testimony about finding Jones's gun in the car as *an example* of why the court found defendant lacked credibility, not as an independent reason for declining to strike the enhancements.

In sum, we find neither legal error nor an abuse of discretion in the trial court's decision not to strike the enhancements.

## C. **The Prior Strike Conviction**

Defendant contends the trial court abused its discretion by denying defendant's motion to dismiss his 2000 strike conviction for willfully and maliciously discharging a firearm at an inhabited dwelling. (§§ 246; 1385, subd. (a); *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 529 (*Romero*).)

"[T]he three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so." (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*).) But the three strikes law "did not remove a sentencing court's discretion to dismiss a defendant's prior strike or strikes to achieve a punishment in the furtherance of justice." (*People v. Solis* (2015) 232 Cal.App.4th 1108, 1124, citing *Romero, supra*, 13 Cal.4th at p. 504.) Our Supreme Court frames a sentencing court's proper inquiry this way: "May the defendant, in light of his or her current crime, and his or her criminal history, background, character, and prospects, be deemed 'outside the . . . spirit' of the Three Strikes law, in whole or in part, and, hence, be treated as though he or she had not suffered the prior strike

conviction?"  (*Solis*, at p. 1124, quoting *People v. Williams* (1998) 17 Cal.4th 148, 161.)  If these factors "manifestly support the striking of a prior conviction and no reasonable minds could differ—the failure to strike would constitute an abuse of discretion."  (*Carmony*, at p. 378.)

In sentencing defendant, the trial court appears to have applied the proper standard.  Summarizing its ruling, the trial court stated:  "I don't think that he falls outside the spirit of that law, not with his criminal history and his repeated unlawful possession of firearms and unlawful possession of a firearm in this instance, and its use under these circumstances, that for some amazing reason wasn't more destructive than we know it to have been."

Contending otherwise, defendant argues that the court ignored "major factors" it should have considered.  Defendant reasons that, to the extent the court failed expressly to address specific details about the strike offense, such as its remoteness, we should conclude that the court ignored these factors.  That is not the law.  The trial court "is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary."  (*People v. Myers* (1999) 69 Cal.App.4th 305, 310; see also *Carmony*, *supra*, 33 Cal.4th at p. 378 [where record is silent, the presumption is that court followed the law].)  Here the record shows that defendant's trial counsel outlined relevant factors in his sentencing memoranda and repeated those factors at the sentencing hearing.  We find nothing in the record to support defendant's view that the court ignored those factors or otherwise abused its discretion.

### D.  Sentence for Unlawful Possession of Ammunition

Finally, defendant contends that his concurrent sentence for unlawful possession of ammunition by a felon should have been stayed under section 654, which precludes multiple punishment for more than one offense arising

53

out a single act or indivisible course of conduct.  (*People v. Hester* (2000) 22 Cal.4th 290, 294.)

Generally, the question whether a course of criminal conduct is divisible within the meaning of section 654 depends on the " 'intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' "  (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253; see also *People v. Deloza* (1998) 18 Cal.4th 585, 592 [multiple punishment includes concurrent or consecutive sentences].)  Here, defendant contends that his convictions for possession of a firearm by a felon and possession of ammunition by a felon arose out of an indivisible course of conduct, such that he cannot be punished for both, so his concurrent sentence for possessing ammunition should have been stayed.  The People concede the error, and we accept that concession.

Pertinent authority holds that section 654 prohibits punishing a defendant for both unlawful possession of a firearm and unlawful possession of ammunition when the ammunition was either loaded into or fired from the firearm.  (*People v. Lopez* (2004) 119 Cal.App.4th 132, 138; *People v. Sok* (2010) 181 Cal.App.4th 88, 100; see also *People v. Broadbent* (2020) 47 Cal.App.5th 917, 922.)  Courts reason that while there may be instances when multiple punishment is lawful for possession of a firearm and ammunition, if the ammunition is loaded into the firearm there is one indivisible course of conduct, as allowing multiple punishment would "parse the objectives too finely."  (*Lopez*, at p. 100.)  In the present appeal, the People acknowledge there is no substantial evidence that defendant possessed ammunition other than in the firearm he used in November 2019. Nor is there evidence that he harbored multiple objectives when he possessed

the loaded firearm.  Thus, the trial court erred by failing to stay punishment for the ammunition offense.

## DISPOSITION

The judgment is modified to stay defendant's sentence for possession of ammunition by a felon.  The trial court is directed to amend the abstract of judgment to reflect this change and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  As so modified, the judgment is affirmed.


TUCHER, P. J.


WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.


*People v. Anderson* (A166291)

55

Trial Court:      Alameda County Superior Court

Trial Judge:      Hon. Thomas M. Reardon

Counsel:      Jeffrey A. Glick, under appointment by the Court of Appeal, for Defendant and Appellant

Rob Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Bridget Billeter, Supervising Deputy Attorney General, Claudia H. Phillips Deputy Attorney General for Plaintiff and Respondent